### UNITED STATES v. SAFEWAY STORES, Inc., (MARYLAND), et al.

### SAME v. KROGER GROCERY & BAKING CO. et al.

### Cr. Nos. 7196, 7197.

District Court, D. Kansas, First Division.
Aug. 30, 1943.

George H. West, U. S. Dist. Atty., of Topeka, Kan., Tom C. Clark and William R. Watkins, Asst. Attys. Gen., and Horace L. Flurry and Earl A. Jinkinson, Sp. Assts. to Atty. Gen., for the plaintiff.

Louis R. Gates, of Kansas City, Kan., Henry N. Ess (of the firm of Watson, Ess, Croner, Barnett & Whittaker), of Kansas City, Mo., and Mitchell T. Neff, of San Francisco, Cal., for Safeway Stores.

Kroger's Case:

Thomas M. Lillard (of the firm of Lillard, Eidson, Lewis & Porter), of Topeka, Kan., and Frank E. Wood and Robert S. Marx (of the firm of Nichols, Wood, Marx & Ginter), both of Cincinnati, Ohio, for Kroger Grocery and Baking Co.

HOPKINS, District Judge.

These are anti-trust prosecutions. Separate indictments were filed against the two principal defendants, Safeway Stores, Incorporated, and Kroger Grocery & Baking Company on January 20, 1943. Each indictment charges in addition various individual defendants, officers and employees of the two companies. Demurrers were filed by the defendants, which after full consideration were sustained by the court.

The two cases have been briefed and submitted as one. The indictments are for all practical purposes the same in the two cases, and the grounds for the demurrers are the same. The demurrers are not stated in identical language, but in purpose and intent each raises the same points, and any ruling of the court in one case is equally applicable in the other.

Conspiracies to restrain and monopolize interstate trade in food and food products are sought to be charged. Each indictment is in two counts, the first count in each case charging an unlawful conspiracy to restrain, and the second count a conspiracy to monopolize in violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1 and 2.

The demurrers were sustained on the grounds—

(1) The allegations of the indictment, and each count thereof, are so general, vague and indefinite, that they do not inform the defendants sufficiently of the nature and cause of the accusations against them so as to enable them properly to prepare a defense thereto; nor to enable them, in the event of a trial and judgment thereunder, to plead an acquittal or conviction in bar of any other proceeding against them based on the same matters as contained in this indictment; nor otherwise meet the requirements of the Fifth and Sixth Amendments to the Constitution of the United States.

(2) The indictment, and each count thereof, fails to allege the commission of any illegal act by the defendants within the jurisdiction of this court, and thus would deprive defendants of their right to trial in the state and district where the offense was committed, which rights are conferred by Art. 3, Sec. 2, Par. 3 of the Constitution of the United States and by the Sixth Amendment.

(3) Each count of said indictment is an attempt to charge the defendants, and each of them, with more than one offense under the laws of the United States. That count one is duplicitous in charging two or more combinations, agreements and conspiracies in the one count; and count two is duplicitous in charging that defendants formed a conspiracy to monopolize and that they have actually monopolized.

The indictment in the Safeway case contains thirty pages made up of thirty-three separately numbered paragraphs; the Kroger indictment, twenty-six pages and thirty paragraphs.

Due to the sameness of the two indictments, it will be necessary only to refer to one in making specific references, and the Safeway indictment will be considered for that purpose. The charging part of the indictment is contained in paragraphs 22 to 27 charging restraint of trade, and identical language is used in paragraphs 28 to 33 in charging monopoly violations in count two. The balance of the indictment is made up of a lengthy narrative concerning the nature, extent, organization and growth of the business conducted by the defendants.

The first paragraph states that the indictment refers to a period of time beginning January 1, 1917, thus covering a period of twenty-five years.

Paragraph 2 covers definitions. It defines in great detail what is meant by chain stores, combination stores, grocery stores, super-markets, etc. Paragraph 3, 4, 5, and 6 name the defendants, who they are, and where they live. No one of them is found in Kansas or is a resident or citizen of the state. It is alleged in each case that one of the defendants does business in this state.

Paragraphs 7 to 17 set out in much detail the general nature of the business conducted by the defendants, including its growth and development, and sets forth historical data with reference to the food industry generally.

Paragraph 19 recites that food and food products are grown, processed and purchased in various states and "shipped in interstate commerce into and through other states."

Paragraph 21 recites that defendants "by virtue of the horizontal and vertical integration" of their business "have and exercise the power to dominate and control" a substantial part of the retail food business.

It is not contended, I believe, that anything in these paragraphs charges an offense under the Sherman Act.

The so-called charging portion of the indictment (in the Safeway case) is found in paragraphs 22 to 24 inclusive. It reads:

"22. For many years prior to the return of this indictment, and continuously up to and including the day of the finding and presentation of this indictment, defendants, and other persons to the grand jurors unknown, well knowing all the facts alleged in this indictment, have wilfully and unlawfully formed and carried out, in part within the District of Kansas, First Division, a wrongful and unlawful combination and conspiracy to unduly, unreasonably and directly restrain interstate trade and commerce in food and food products, produced, distributed and sold in many states of the United States, in violation of Section 1 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies" (26 Stat. 209, 15 U.S.C.A. § 1), as amended, commonly known as the Sherman Act.

"23. The aforesaid combination and conspiracy has consisted in a continuing agreement and concert of action among the defendants, the substantial terms of which have been:

"a. That the defendants acquire by merger and otherwise the business of independent retail grocers and local chains throughout the United States.

"b. That the defendants select local areas throughout the United States wherein they use their dominant advantage to injure and destroy the competition of independent grocers, meat dealers and small local food chains,

"(1) By selling at retail in those areas sufficiently lower than elsewhere, until control or the desired percentage of total retail business is obtained, using the income from other areas and from operations of the business other than retail, to offset the losses or reductions in profits incident to such price cutting,

"(2) By combining with other national food chains, operating in such selected areas, to fix, maintain and follow the prices established by defendants.

"c. That defendants systematically prevent competition in selected trade areas throughout the United States,

"(1) By combining with the independent grocers and local and national food chains operating therein to fix the retail prices and terms upon which food would be sold in such areas.

"(2) By combining with manufacturers of food and food products and others to fix and maintain the resale prices and policies in such selected areas and to aid and assist such manufacturers and others in enforcing the resale prices so fixed and established.

"d. The defendants obtain for themselves a systematic discriminatory buying preference over competitors by controlling the terms and conditions upon which manufacturers, processors, packers and other suppliers of food and food products shall sell to them and to their competitors,

"(1) By coercing suppliers to sell to other wholesalers and retailers on terms and conditions dictated by defendants,

"(2) By coercing suppliers, through threats of withdrawal of their patronage and otherwise, to secretly maintain two price structures on their products, the lower of which would be charged to the defendants and the higher to their competitors,

"(3) By requiring suppliers to give defendants secret preferential discounts and

prices in connection with purchases of defendants,

"(4) By requiring suppliers secretly to give defendants protection against price increases and price declines,

"(5) By coercing suppliers to discontinue selling direct to their competitors while secretly continuing to sell direct to the defendants at lower prices,

"(6) By inducing suppliers to divert a large portion of their plants and facilities to filling defendants' orders and then threatening to withdraw their patronage unless such suppliers secretly give defendants lower prices and larger discounts on their purchases,

"(7) By bidding in fresh fruits and produce on public auctions on the secret understanding with the owner thereof that settlement shall be made on such purchases at a lower price than the price bid at the auction,

"(8) By coercing suppliers to grant preferential discounts and rebates upon various pretexts unrelated to any actual saving or service to the supplier,

"(a) By systematically exacting from suppliers large and arbitrarily fixed rebates called 'advertising' and 'promotional' allowances for pretended services,

"(b) By demanding discounts and allowances for so-called 'floor space rentals', 'store sales service,' 'feature payments,' 'label and container allowances,' 'sign space rentals,' and 'mass displays,' for pretended 'services' rendered to suppliers but in reality performed in the ordinary course of selling the defendants' own merchandise at retail, and so-called 'special newspaper supplement space sales' and 'special circular supplement sales' in which defendants advertise only their own merchandise for sale.

"e. That defendants foster false comparisons of their prices with the prices charged by competitors and false reports calculated to conceal their activities and perpetuate their dominance and control of the distribution of food and food products,

"(1) By inspiring and publishing statements calculated and intended to foster false comparisons of their prices with prices charged by independents and small local chains,

"(2) By organizing, financing and preparing publicity and propaganda for false front farmer, consumer, and housewife organizations, civic clubs and other organizations, and using the statements of such organizations in support of such false comparisons and reports as to prices, values and services offered by defendants and their competitors,

"(3) By the systematic practice of secretly enhancing their actual prices above their advertised prices through short-changing, short-weighting and marking up prices on store tags and purchases.

"24. During the period of time covered by this indictment, and for the purpose of forming and effectuating the aforesaid combination and conspiracy, the defendants, by agreement and concert of action, have done the things which, as hereinbefore alleged, they conspired to do."

■ It is my view that this attempt to charge a criminal offense as set out above is wholly lacking in the clarity and particularity requisite to inform the defendants of the nature and cause as required by the Fifth and Sixth Amendments. The Fifth Amendment confers upon every person charged with a crime the right to be informed so that he may prepare his defense, and the Sixth Amendment contains the unconditional requirement that the accused shall enjoy the right to be informed of "the nature and cause of the accusation."

A landmark decision interpreting these provisions is the case of United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588, wherein Chief Justice Waite said:

"The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defence, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances." Page 558 of 92 U.S.

"The accused has, therefore, the right to have a specification of the charge against him in this respect, in order that he may decide whether he should present his defence by motion to quash, demurrer, or plea; and the court, that it may determine whether the facts will sustain the indictment." Page 559 of 92 U.S.

And, in an Eighth Circuit case, Fontana v. United States, 262 F. 283, it was said:

"The basic principle of English and American jurisprudence is that no man shall be deprived of life, liberty, or property without due process of law; and notice of the charge or claim against him, not only sufficient to inform him that there is a charge or claim, but so distinct and specific as clearly to advise him what he has to meet, and to give him a fair and reasonable opportunity to prepare his defense is an indispensable element of that process. When one is indicted for a serious offense, the presumption is that he is innocent thereof, and consequently that he is ignorant of the facts on which the pleader founds his charges, and it is a fundamental rule that the sufficiency of an indictment must be tested on the presumption that the defendant is innocent of it and has no knowledge of the facts charged against him in the pleading." Page 286 of 262 F.

As to the duty specifically to aver the facts upon which the offense rests, the Court says: "It is essential to the sufficiency of an indictment that it set forth the facts which the pleader claims constitute the alleged transgression, so distinctly as to advise the accused of the charge which he has to meet, and to give him a fair opportunity to prepare his defense, so particularly as to enable him to avail himself of a conviction or acquittal in defense of another prosecution for the same offense, and so clearly that the court may be able to determine whether or not the facts there stated are sufficient to support a conviction." Page 286 of 262 F.

█ The protection thus afforded applies to all criminal prosecutions including, of course, anti-trust indictments under the Sherman Act. The holding in the Cruikshank case was adhered to in an anti-trust case, In re Greene, C.C., 52 F. 104, 111, where it was said:

"We regard it as well settled by the authorities that an indictment, following simply the language of the act, would be wholly insufficient, for the reason that the words of the statute do not of themselves fully, directly, and clearly set forth all the elements necessary to constitute the offense intended to be punished. * * *

"Under the principle established by those cases, the several counts of the present indictment must be tested, not by the general recitals and averments thereof, although in the words of the statutes, but by the specific acts or particular facts, which are alleged to have been actually done and committed by the accused. If the particular acts or facts charged do not, as a matter of law, constitute contracts, combinations, or conspiracies in restraint of trade and commerce among the several states, or a monopoly or attempt to monopolize any part of such trade or commerce, no amount of averments and allegations that the accused 'engaged in a combination,' or 'made contracts in restraint' of such trade or commerce, or 'monopolized' or 'attempted to monopolize' the same, will avail to sustain the indictment."

In Nash v. United States, 229 U.S. 373, 376, 33 S.Ct. 780, 781, 57 L.Ed. 1232, the court said: " * * * that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade."

That scrutiny of the facts is necessary before the test may be applied is stated by the Court in Appalachian Coals, Inc., v. United States, 288 U.S. 344, 360, 53 S.Ct. 471, 474, 77 L.Ed. 825. With reference to the test, the Court said: "In applying this test, a close and objective scrutiny of particular conditions and purposes is necessary in each case. Realities must dominate the judgment. * * *"

And in Sugar Institute v. United States, 297 U.S. 553, 600, 56 S.Ct. 629, 643, 80 L. Ed. 859, speaking of the Sherman Act, the necessity of considering the facts is thus stated: " * * * Thus in applying its broad prohibitions, each case demands a close scrutiny of its own facts."

In United States v. Colgate & Co., D.C., 253 F. 522, affirmed 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443, defendant was indicted for conspiracy to fix resale prices. The Court said, page 528 of 253 F.: "The facts in no particular combination, against any one set of wholesalers or retailers alleged to have been in combination with the defendant, are given, but merely that assurances and promises were made * * *. This language is too general, and the defendant has the right at least to be informed of some one particular infraction of the law that it is claimed it has committed. It would be impossible to intelligently prepare a defense or answer to this indictment, as it involves the defendant's dealings with its wholesale and retail cus-

tomers throughout the territory named, covering a period of three years. This is too indefinite, and there ought to be no difficulty, if such conditions exist, as set forth in the indictment, to name some specific instance of the alleged combination, and state the same in detail."

In a recent case, United States v. Wayne Pump Co., D.C., 44 F.Supp. 949, 958, the indictment charged that defendants "determine jobbers' resale prices for computer pumps, refuse to sell computer pumps to any jobber failing or refusing to adhere to such resale prices, and eliminate discounts to all jobbers in the event of a general failure by jobbers to adhere to said resale prices."

This particularization in the indictment when met by demurrer was held insufficient. The Court said, page 958 of 44 F. Supp.: " * * * if these conditions exist, the Government should have no difficulty in setting forth at least one specific instance of where defendants determined the resale price at which jobbers might resell computer pumps. If this condition does exist, surely the Government must be in possession of the facts, and they should be set out in the indictments, so as to reasonably inform defendants of the offense with which they are charged.".

Following that, the court further said: " * * * The charges are much too general. They do not adequately describe the nature of the alleged unlawful conspiracy·agreements or arrangements which defendants are accused of having made, nor show how the defendants became parties thereto, nor how they collaborated in doing the unlawful things; nor set out any unlawful means whereby the unlawful objectives were accomplished." Page 959 of 44 F.Supp.

In other cases to the same effect are United States v. Armour & Co., D.C., 48 F.Supp. 801; Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734. United States v. Carll, 105 U.S. 611, 26 L.Ed. 1135; White v. United States, 10 Cir., 67 F.2d 71. Government counsel cite the case of Hagner v. United States, 285 U. S. 427, 431, 52 S.Ct. 417, 76 L.Ed. 861, to the effect that formal defects in an indictment will be disregarded. But it should not be necessary to observe that a failure to charge with the particularity required by the Constitution is no mere formal defect, but is a defect involving the fundamental and substantial rights of the accused.

I will not undertake to completely analyze the charging portion of the indictment in detail, but a consideration of the same will disclose that it is devoid of factual allegations informing the defendants how, when, where, and under what circumstances they have conspired to restrain or monopolize interstate commerce. The indictment charges that defendants "select local areas", but no areas so selected are named; that defendants sell at retail in those areas "sufficiently lower than elsewhere", but the areas are not described nor time given; that defendants combine with other national food chains "to fix, maintain and follow the prices established by defendants", but the other parties to the combination are not named nor the areas of operation defined, and defendants are not informed as to the prices fixed nor the food items involved; that defendants systematically prevent competition in selected areas by combining with other food chains to fix retail prices and by combining with manufacturers to fix and maintain resale policies, but the parties to such combinations are not named, no attempt is made to define the selected area, although the indictment covers a period of twenty-three years.

This is sufficient to illustrate in some small way the defects in these indictments. Surely the government must know the other chains, the manufacturers with which defendants combined; the local and selected areas referred to in its allegations. It must be prepared to prove these things. It would seem, therefore, that it should have been an easy matter to charge in the indictment somewhat in this fashion: that defendants conspired with a specifically named party in the Topeka or Wichita area to sell sugar or some other commodity in the month of July, 1940, at 5¢ per pound when at the same time it was selling the same kind of sugar elsewhere throughout the United States at 7¢ per pound, and that this was done in order to injure and destroy the small groceries in Topeka and Wichita, etc. Failure to allege with some particularity seems to me to be indefensible.

As observed by the Court in Asgill v. United States, 4 Cir., 60 F.2d 780, 784, a charge of conspiracy is the most difficult of charges to be met unless defendants are fully informed of the facts upon which the

prosecution will depend. The right to be informed of the facts is fundamental, and it is not in harmony with the philosophy and spirit of a free people living under a written constitution that courts will accept generalities for the facts.

### The Question of Venue.

■ Each and every person charged with crime has guaranteed to him that he shall enjoy the right to a trial in the state and district wherein the crime shall have been committed. This right is anchored in the Constitution, Art. 3, Sec. 2, Cl. 3; and the Sixth Amendment. And from this right, there arises the requirement that the indictment by its allegations disclose clearly and specifically the commission of the crime within the state and district wherein the indictment is pending, and where venue is not disclosed by the allegations of the indictment, and if the point is properly raised, as it is here, the defect is fatal to the charge, and no amount of rationalizing contention can add words to the indictment or render it effective.

■ Conspiracies under the Sherman Act are complete when formed. The act of conspiring is the very condition to liability; overt acts in furtherance of the conspiracy (an essential element under the general conspiracy statute R.S. 5440, 18 U.S.C.A. § 88) being no part of the offense.

As stated by Justice Holmes in Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 782, 57 L.Ed. 1232: "Coming next to the objection that no overt act is laid, the answer is that the Sherman act punishes the conspiracies at which it is aimed on the common-law footing,—that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability. The decisions as to the relations of a subsequent overt act to crimes under Rev.Stat. § 5440 [18 U.S.C.A. § 88] in Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 [Ann.Cas.1914A, 614], and Brown v. Elliott, 225 U.S. 392, 32 S.Ct. 812, 56 L.Ed. 1136, have no bearing upon a statute that does not contain the requirement found in that section." And in United States v. Norris, D.C., 255 F. 423, 425, it was said: "Indictments under the Sherman Act are more simple than those under Rev.St. § 5440 (Comp.St. 10201 [18 U.S.C.A. § 88]), because the offense is the agreement alone, no overt act being a part of it. The agreement being the crime, that must be charged, and nothing more. If the indictment relates the elements of the agreement in sufficiently clear terms, defendants are informed of what they are required to meet. They need not be told what means or measures they had decided on to carry out their agreement, or that any act was done by any person in the execution of the agreement. * * * It is the conspiracy which is denounced by the law, and that was complete when there was a meeting of minds to obstruct commerce."

■ It would seem, therefore, that in Sherman Act prosecutions venue should be laid in the district where the conspiracy is formed, but beginning with the lower federal courts in 1922, In re National Window Glass Workers, D.C., 287 F. 219, 227; Williams v. United States, 5 Cir., 295 F. 302, 304; United States v. National Malleable & Steel C. Co., D.C., 6 F.2d 40; and accepted by the Supreme Court, United States v. Trenton Potteries Co., 273 U.S. 392, 402, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989, and given recent expression in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 250, 60 S.Ct. 811, 84 L.Ed. 1129, is the rule that venue can be laid in a district wherein the conspiracy is made effective by overt acts, although formed elsewhere; that specification in an indictment of such overt acts is sufficient for venue purposes. A search of the early American cases indicates that this rule is based upon the fiction that overt acts in furtherance of a conspiracy constitute a renewal or re-formation of the conspiracy, and while I am opposed to the view that such a fiction should outweigh the strict demands of the constitution that the offense—the formation of the conspiracy—be prosecuted in the district where committed, I must recognize the binding effect of these holdings of the Supreme Court. And it remains, therefore, to determine whether venue has been laid in Kansas by the allegation of overt acts in Kansas of a kind that would give force and effectiveness to the alleged conspiracy. That portion of the indictments carefully labelled and assigned the duty of laying the venue reads:

### Jurisdiction and Venue

"26. The combination and conspiracy herein alleged has been entered into and carried out in part within the District of Kansas and within the First Division thereof, where the defendant Safeway Stores, Inc., a Nevada corporation, has re-

tail food stores, offices, and agents, and transacts business. During the period of said combination and conspiracy and within three years next preceding the presentation of this indictment, the defendants have performed within the District of Kansas, and within the First Division thereof many of the acts set forth in Paragraph 23 hereof. Particularly, the said defendants have continuously since September 1, 1939, and down to the present time, advertised food and food products in Kansas City, Kansas, and elsewhere in the state of Kansas, below cost and below the price charged by them for similar products in other locations, for the purpose and with the intent of injuring and destroying competition of independent concerns and local chain stores."

■ These allegations in my opinion, are inadequate. Summed up they are nothing more than conclusions.

In Martin v. United States, 8 Cir., 168 F. 198, Judge Walter H. Sanborn, one of the greatest of the federal judges, said: "The averment that an act innocent in itself, but criminal if fraudulently done, was done 'fraudulently' or with intent to defraud, is but a bald conclusion of law and is futile. A crime is made up of acts and intent, and these must be set forth in the indictment with reasonable particularity of time, place, and circumstances." Page 205 of 168 F.

To the same effect is the decision of United States v. Post, D.C., 113 F. 852, where the court said: "There is no direct assertion of her intention, further than, by implication, that she was 'fraudulently intending to get possession of such money and convert the same to her own use, without rendering to the person sending the same any service or thing of value therefor.' The use of the word 'fraudulently' is not alone a sufficient allegation of a fraudulent intent. The circumstances and declared intention must show the act to be such." Page 855 of 113 F.

In my opinion this venue paragraph is too indefinite and vague. It is to be noted that the conspiracy is alleged to have begun in 1917. In time, it covers a period of twenty-five years. Its scope embraces the restraint of interstate trade and commerce in food and food products in many states of the United States. The government contends that commission of the crime is properly and adequately laid in the state and district of Kansas by the bald allegation that "the combination and conspiracy herein alleged has been entered in-

to and carried out in part within the District of Kansas and within the First Division thereof", and by the similar allegation elsewhere that the defendants "have wilfully and unlawfully formed and carried out, in part within the district of Kansas" the alleged wrongful and unlawful conspiracy.

What portion of this broad conspiracy was entered into or carried out in Kansas, and what portion of the conspiracy was entered into and carried out elsewhere than in Kansas, are left entirely to conjecture. Without disclosing what portion of the conspiracy with its duration of some twenty-five years and with its scope that includes in general terms the restraint of interstate trade and commerce in the all comprehensive field of "food and food products" was entered into or carried out in Kansas, the indictments fail to show venue here.

If any two or more of the numerous allegations constituting the crime are demurrable, then it may well be such insufficient allegations are the very ones, and the only ones, bearing on the point of Kansas venue. This general form of pleading, the allegation of a conspiracy of twenty-five years in time and covering the alleged restraint in the entire field of food and food products, followed by the allegation that "in part" the conspiracy was entered into and carried out in Kansas, wholly fails to meet the constitutional requirement that a defendant can only be put to trial in the state and district wherein the crime was committed. Such allegations are mere conclusions and vague and indefinite as conclusions. Instead of charging and setting out those particular phases of the conspiracy claimed to have been entered into in Kansas, or particularizing acts having definite relation to the conspiracy which were done in Kansas to carry out the conspiracy, attempt is made by the catch-all phrases referred to above to be in a position to offer proof of anything done within the state of Kansas, without having advised the defendants in advance of the trial as to what was actually done within the jurisdiction of this court. These general and vague allegations are insufficient to satisfy the requirement that the indictment must show on its face that the crime was committed within this state and district.

■ In the above quoted venue allegation the only specific overt act pleaded with anything approaching definiteness to establish venue and jurisdiction is that the defendant "advertised below cost" in Kansas City,

Kansas. It is not alleged that the defendants sold below cost in Kansas; they only "advertised below cost"; something nowhere else mentioned in the indictments. When this strange venue allegation is compared with the indictment, nowhere in the "substantial terms" is found the allegation "advertised below cost" or even "sold below cost." The substantial terms alleged use the phrases: "selling lower than elsewhere"; "fixed the retail prices"; "enforcing the resale prices so fixed", etc. But nowhere among all the alleged "substantial terms" of the conspiracy are the words "advertised below cost" or "sold below cost" used. There can be no question but that the venue allegation is a fatally defective departure from the "substantial terms" because it appears upon the face of the indictment that "advertised below cost" is not a part of the alleged conspiracy.

■ This attempt to charge an "overt act" within the jurisdiction of this court is in the nature of a conclusion rather than the charge of an overt act. It would be impossible for the defendants to meet the charge. Consider the element of time alone, and advertisements that may have been published on any one of hundreds of days. Numerous stores and food items are involved. Defendants are regularly selling at each retail store more than three thousand food items. The price of these food items changes daily.

The defendants being charged in this blanket fashion, each food item sold throughout the three-year limitation period would have to be checked as to cost, and as to selling price of the same item in each one of the several thousand stores, in order to determine whether each or any of the advertised items was advertised for sale at a price below cost or lower than that charged for similar items in any one of the thousands of stores located in a dozen or more states. But that only would partially complete the task, for the Government counsel concede that all sales below cost are not subject to condemnation, and that all sales at lower prices than the defendants charge for similar products in defendants' other stores are not subject to condemnation, economic reasons frequently justifying sales at one store below sale prices at other stores. And there would still remain the question whether the advertised prices on specific items below cost or lower than charged at other stores were justifiably lower, or were "for the purpose and with the intent of injuring or destroying competition of independent concerns and local chain stores." The mere advertising of prices that were lower than cost or lower than those charged at other stores may have been wholly innocent and justifiable for economic reasons. This general charge without giving particulars as to the place, time and circumstances, is insufficient to brand the alleged acts in Kansas as criminal or in furtherance of a criminal conspiracy, and no one would contend that they inform defendants with particularity as to time, place and circumstances.

If the Grand Jury had knowledge that a certain store in Kansas City, Kansas, or elsewhere within this state had deliberately and designedly advertised or sold sugar, coffee or lard, or any other specific item, below cost or below the regular price charged elsewhere with the intention of injuring and destroying competing stores at some specified location, it would have been a simple matter to make a specific charge with reasonable particularity of time, place and circumstances. An indictment in that form would have properly pleaded an overt act, and the defendants would thereby have been given knowledge in advance of the trial.

A consideration of the recent Socony-Vacuum decision, supra, will demonstrate the total lack of a sufficient venue allegation here. In the Socony-Vacuum case the prosecution relied for Wisconsin venue upon allegation and proof of overt acts in Wisconsin, as the alleged conspiracy had not been formed in the state and district of Wisconsin where the indictment was returned and the case tried. Only one article of commerce (tank car gasoline) was involved in that case. The conspiracy charged had for its purpose the artificially raising and fixing of noncompetitive prices on gasoline in tank car lots in the "spot markets" in certain fields. To fix venue in Wisconsin the indictment alleged "that most of defendant major oil companies have sold large quantities of gasoline in tank car lots to jobbers in [the Wisconsin] district at the 'artificially raised and fixed and noncompetitive prices'; that they have solicited and taken contracts and orders' for gasoline in that district; and that they have required retail dealers and consumers therein 'to pay artificially increased prices for gasoline' pursuant to the conspiracy." [310 U.S. 150, 60 S.Ct. 820, 84 L.Ed. 1129.] Those venue allegations charged specific acts,

which were within the very terms of the conspiracy which was there charged, and appear specific and definite in the extreme when lined up and compared with the very meagre attempt at venue particularization here, but none the less two of the Justices held the Socony-Vacuum venue charge inadequate. Justice Roberts in a dissenting opinion said: "The Government relied for venue in the Western District of Wisconsin upon the commission in that district of overt acts in aid of the alleged common enterprise. I think the indictment fails to allege, and the evidence fails to disclose, the commission of any such act in the district of trial."

 The Tenth Circuit Court of Appeals has always been committed to the stringent rule of interpretation in considering the indefiniteness of indictments. White v. United States, 67 F.2d 71.

 Courts have been especially meticulous and rigid in requiring particularity and definiteness in venue allegations. In Skelley v. United States, 10 Cir., 37 F.2d 503, it was held:

"Indictment charging that defendant at Oklahoma City willfully, unlawfully, and fraudulently received, concealed, bought, and facilitated transportation and concealment after importation of smoking opium, under 21 U.S.C.A. § 174, held insufficient for failure to designate specifically the place where the offense was committed; nature and cause of accusation not being sufficiently stated to comply with Const. Amends. 5, 6.

"Under Const. Amends. 5, 6, requiring that indictment inform the accused of the nature and cause of the accusation, indictment must be sufficiently certain as a pleading to enable the defendant to make his defense, by charging the crime with particularity, and must be sufficiently certain to enable him to plead double jeopardy in case he should be indicted again for the same offense."

In holding that the demurrer should have been sustained, the Court said: "Oklahoma City has a population of about 150,000, and of course, there are innumerable places therein where the crime charged might have been committed. The police officers who made the arrest and discovered the drug in the possession of appellant gave the name of the street and the street number in their testimony, where the drug was found; but for some inexplainable reason the pleader did not put the location in the indictment. Nor did he otherwise 'earmark' the charge as Judge Booth aptly terms it in Myers v. United States, 8 Cir., 15 F.2d [977], 987 et seq., so as to separate and make certain from the general charge therein contained the particular offense of which appellant was accused and was to be put on trial."

In an earlier case, United States v. Burns, C.C., 54 F. 351, 359, it was said: "The defendants should be advised more clearly * * * what was it, and where was it? The evidence must show it, and the district attorney must be advised as to the place, or the prosecution must fail. Then why should not the defendants be informed? The government does not wish their conviction unless they be guilty, and it should not be permitted to demand their conviction until it has given them a full and fair opportunity to make their defense to a plain and positive charge."

 Government counsel make the point that the allegation "unlawfully formed and carried out in part within the district of Kansas" constitutes a direct charge that defendants formed a part of the conspiracy within the district of Kansas. The allegation so construed would be a conclusion and amount to nothing. Even on that view of the prosecution the indictment does not allege what part of the conspiracy was formed in Kansas. Neither does it allege definitely that anything was done in Kansas which was a part of the conspiracy. The allegation is not specific and gives no information to the defendants as to what they would have to meet either on the subject of the formation in Kansas of a conspiracy or the carrying out of a conspiracy in Kansas.

 Besides, rules of construction require that such a limiting clause be confined to the last antecedent. Puget Sound Ry. v. Benson, 9 Cir., 253 F. 710; United States v. Hughes, 3 Cir., 116 F.2d 613. Under this rule the words "in part" refer to the last antecedent, namely, "carried out". Such is the more rational interpretation of the phrase. The phrase amounts to a charge that a conspiracy was formed somewhere—no place stated—and carried out in part in Kansas. The indictment throughout its entire length supports this conclusion and negatives the idea that the defendants did any conspiring in Kansas. It shows on its face that all of the defendants reside, and that the headquarters

and managing offices of the defendants are located a thousand or more miles distant from Kansas; that all employees are "entirely controlled and dominated by the headquarters defendants" who "dominate and control" the buying, selling and advertising policies; that all branch warehouses, manufacturing plants, division headquarters and all branch warehouses, manufacturing plants, division headquarters and all similar managerial activities are outside of the state and district of Kansas. Clearly the formation of plans and policies, which would include, of course, the formation of the alleged conspiracy, is foreign to this judicial district. The entering into of a conspiracy contemplates consultation and planning by those who are in control of and who dominate the activities of a large corporation. The indictment indicates on its face that the activities of the defendants are limited to the operation of local retail grocery stores in Kansas, and there is no allegation that any of the managing officials were ever present in Kansas. How different the facts in all those cases, supra, holding overt acts in the district a sufficient basis for venue. Here, all defendants named in these two indictments are foreign to this district. No individual named has his residence in Kansas. None was found here. No corporation named is a Kansas corporation, and so far as is disclosed by the indictment, no corporation named a defendant has been admitted to do business in Kansas.

All that has been said applies equally to both counts of these indictments.

### Duplicity

If count one in each of these indictments were given effect as alleging an offense, it is my opinion they are then bad for duplicity. See United States v. Winslow, D.C., 195 F. 578, 580, affirmed 227 U.S. 202, 33 S.Ct. 253, 57 L.Ed. 481; United States v. Borden Co., D.C., 28 F.Supp. 177; Id., 308 U.S. 188, 194, 60 S.Ct. 182, 84 L.Ed. 181; Rice v. Standard Oil Co., C.C., 134 F. 464. Count two in each indictment is bad for the reasons aforesaid, and for the reason that count two charges both the formation and carrying out of the conspiracy to monopolize; formation and execution being distinct crimes under Section 2 of the Sherman Act, 15 U.S.C.A. § 2. United States v. Shapiro, 2 Cir., 103 F.2d 775; United States v. Patterson, D.C., 201 F. 697, 725. More than one offense may not be charged in a single count of an indictment. Bratton v. United States, 10 Cir., 73 F.2d 795; United States v. Dembowski, D. C., 252 F. 894.

Considering the whole matter, I am forced to the conclusion that the demurrers must be sustained.